**POTTER HANDY LLP**
Mark D. Potter (SBN 166317)
James M. Treglio (SBN 228077)
Isabel Rose Masanque (SBN 292676)
classactions@potterhandy.com
100 Pine St., Ste 1250
San Francisco, CA 94111
(415) 534-1911
Fax: (888) 422-5191

Attorneys for Plaintiff, on behalf of ~~themselves~~ himself and all others similarly situated

**UNITED STATES DISTRICT COURT~~SUPERIOR COURT OF CALIFORNIA~~**

**NORTHERN DISTRICT OF CALIFORNIA~~COUNTY OF SAN MATEO~~**

SCOTT EVANS, on behalf of himself and all others similarly situated

Plaintiffs,

v.

THE HOME DEPOT, INC., a Delaware Corporation and DOES 1-100, inclusive

Defendants.

CASE NO. 3:26-cv-02395-RFL

**FIRST AMENDED CLASS COMPLAINT FOR VIOLATIONS OF:**

**(1) PENAL CODE § 630 ET SEQ. (CALIFORNIA INVASION OF PRIVACY ACT);**
**(2) WIRETAP ACT, 28 U.S.C. § 2510 *et seq*.**
**(3) CALIFORNIA PENAL CODE § 502 (CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT);**
**(4) ART. 1, § 1, CALIFORNIA CONSTITUTION (INVASION OF PRIVACY); and**
**(5) CAL. BUS. & PROF. CODE §17200, ET SEQ. (CALIFORNIA UNFAIR COMPETITION LAW)**

**DEMAND FOR JURY TRIAL**

Class Representative Plaintiff Scott Evans ("Plaintiff"), by and through their his attorneys, individually and on behalf of others similarly situated, allege upon information and belief as follows:

## NATURE OF THE ACTION

1. Defendant THE HOME DEPOT, INC, a Delaware Corporation –("Defendant") owns and operates a website https://www.homedepot.com (the "Website" or "Home Depot").

2. When users visit the Website, including the Home Depot homepage and product-search pages, Defendant causes trackers, cookies, pixels, event listeners, session recording scripts, canvas-fingerprinting scripts, local-storage objects, session-storage objects, and third-party network requests developed or operated by Google, Meta/Facebook, Quantum Metric, PerimeterX, Akamai, ThreatMetrix, Qualtrics, Microsoft/Bing, Adobe, AppNexus, Pinterest, Agkn, Forter, Sprinklr, Getamigo, Go-mpulse, and other tracking vendorsWhen users visit the Website, Defendant causes numerous trackers and cookies developed and operated by Google, Meta, Quantum Metric, PerimeterX, Akamai, ThreatMetrix, Qualtrics, Microsoft, AppNexus, and Pinterest (the "Trackers") to be installed, executed, or stored on Website visitors' internet browsers and devices. Defendant uses those technologies to collect and transmit identifying information, browsing activity, page views, search and input interactions, device and browser information, IP-address-related information, geolocation or ZIP-code-related information, persistent identifiers, advertising identifiers, analytics identifiers, and other data points that reveal users' behavior and activity on the Websiteinstalled on Website visitors' internet browsers. Defendant then uses these Trackers to collect Website visitors' identifying information, as well as dozens of other data points that reveal the users' behavior and activity on the Website, subjecting the user to unwanted and intrusive communications by would-be advertisers trying to sell the same or similar product to the user over and over and over again.

3. Because the Trackers intercept, acquire, record, transmit, and disclose information about Website visitors' interactions with the Website in real time or contemporaneously with those interactions, including keystrokes, input events, page content viewed, product-search activity, mouse movements, scroll behavior, session activity, page URLs, and shopping behavior, the

Trackers constitute unlawful wiretapping under Section 2511 of the Electronic Communications Privacy Act ("ECPA") and Section 631 of the California Invasion of Privacy Act ("CIPA")Because the Trackers intercept information about the Website visitors' interactions with the Website, the Trackers constitute unlawful wiretapping under Section 2511 of the Electronic Communications Privacy Act ("ECPA") and Section 631 of the California Invasion of Privacy Act ("CIPA").

4. Because the Trackers also capture, record, decode, or transmit routing, addressing, or signaling information, including IP-address-related information, geolocation or ZIP-code-related information, browser and device identifiers, user-agent information, persistent visitor identifiers, session identifiers, advertising identifiers, analytics identifiers, third-party request URLs, and destination domains, the Trackers constitute pen registers and trap-and-trace devices or processes under CIPABecause the Trackers also capture Website visitors' "routing, addressing, or signaling information," the Trackers each constitute a "pen register" under Section 638.50(b) of CIPA. See *Greenley v. Kochava, Inc.*, 2023 WL 4833466 (S.D. Cal. July 27, 2023). By installing and using the Trackers without Plaintiff's prior consent and without a court order, Defendant violated CIPA section 638.51(a)Trackers without Plaintiff's prior consent and without a court order, Defendant violated CIPA section 638.51(a).

5. Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents, and to recover statutory damages for Defendant's violation of the ECPA and CIPA.

## PARTIES

6. Plaintiff Scott Evans resides in Redwood City, California and has an intent to remain there, and is therefore a citizen of California. Plaintiff was physically located in California each time he visited the Website. Plaintiff accessed the Website in December 2025 and again in January 2026Plaintiff Scott Evans resides in Redwood City, California and has an intent to remain there, and is therefore a citizen of California. Plaintiff was in California when he visited the Website.

7. Defendant The Home Depot, Inc., a Delaware Corporation, with its principal place of business located in Atlanta, Georgia.

~~7.~~8. The entity name that appeared to Plaintiff on the Website and related materials was "Home Depot."

**VENUE AND JURISDICTION**

~~8.~~9. This Court has federal-question jurisdiction over Plaintiff's Federal Wiretap Act claim under 18 U.S.C. § 2510 et seq. and supplemental jurisdiction over Plaintiff's California statutory and constitutional claims because they arise from the same alleged Website tracking, interception, access, data-storage, and data-transmission conduct.~~This Court has jurisdiction over this action under California Code of Civil Procedure § 410.10. The aggregated amount of damages incurred by Plaintiff and the Class exceeds the $25,000 jurisdictional minimum of this Court. The amount in controversy as to the Plaintiff individually and each individual class member does not exceed $75,000, including interest and any pro rata award of attorneys' fees, costs, and damages~~. Venue is proper in this District because Plaintiff resides in Redwood City, California, Plaintiff was physically located in California during the alleged Website visits, Plaintiff used location information associated with San Carlos, California and probably ZIP code 94061 during Website use, and the original Complaint alleged that Defendant does business in California and San Mateo County~~Venue is proper in this Court under California Code of Civil Procedure §§ 395(a) and 395.5 because Defendant does business in the State of California and in the County of San Mateo. Defendant has obtained personal information about Plaintiff in the transaction of business in the County of San Mateo which has caused both obligations and liability of Defendant to arise in the County of San Mateo~~.

## I. INTRODUCTION

### A. The California Invasion of Privacy Act

1. The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

2. Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); see also *Greenley, supra*, 2023 WL 4833466, at *15 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

3. Individuals may bring an action against the violator of any provision of CIPA—including CIPA sections 630 and 638.51—for $5,000 per violation. Cal. Penal Code § 637.2(a)(1).

**B. The Federal Wiretap Act**

4. The ECPA was originally enacted in October 1986 to extend privacy protections to emerging technologies. In drafting the legislation, Congress acknowledged that "[t]he dramatic development of the Internet has transformed methods of gathering, processing and sharing information." Senate Judiciary Committee Report (S. Rep. No. 99-541, 1986). Therefore, the statute aimed to address "individuals' concerns that a sufficient degree of privacy and the integrity of personal information are maintained in an age of modern communications and information storage." *Id.*

5. Although limiting overreach by law enforcement was one of the main purposes of the statute, the ECPA explicitly applies to private actors, including "any individual, partnership, association, joint stock company, trust, or corporation" who illegally intercepts, or attempts to intercept, "the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device. 18 U.S.C.A. § 2510(4)(6).

6. The statute authorizes individuals to recover civil damages of up to $10,000 from any person who violates the provisions of the ECPA.

## II. DEFENDANT ILLEGALLY INTERCEPTS THE CONTENTS OF ELECTRONIC AND WIRE COMMUNICATIONS AND ILLEGALLY CAPTURES IDENTIFYING INFORMATION

### A. Overview of Website Tracking Technology

7. Website tracking technology originally consisted of simple tools such as first-party cookies accessible only by the domain (website address) that set the cookies. However, as online advertising and analytics advanced, the industry increasingly relied on third party cookies which are set and accessed by domains other than the website a user originally visited. Over time, websites began implementing techniques which enabled the sharing of data collected by first-party cookies with third party domains, giving them access to user activity.

8. In addition to first-party and third-party cookies, the technology has further evolved into an advanced and interconnected system of methods that are capable of tracking the behavior of users across multiple websites, devices, and sessions using tools such as pixels, device "fingerprinting," and other real-time data exchanges.

#### *i. Cookies*

9. A cookie is a small text string with data created by a website's server and transmitted to a web browser, which then stores the string on the user's device. When the user revisits the website, the browser sends the string along with the HTTP request, allowing the tracker to recognize the user and build sophisticated profiles. These cookies can remain on the device for years, enabling long-term tracking and profiling.

10. When the same third-party tracker appears on multiple websites, it can use its cookies to build a comprehensive profile of users by merging data from various sources. This allows for detailed tracking of individuals' browsing habits, preferences, and behaviors across the internet.

11. Trackers and their associated cookies are installed and operate automatically and invisibly when users visit websites. Users are generally unaware that their data is being collected and shared with third parties or that cookies are storing information on their device, as the process occurs in the background without any visible signs.

#### *ii. Pixels*

12. Pixel "events" are JavaScript tracking codes that send detailed information about user actions to third-party servers, such as Facebook and Google, in real-time.

13. Common user events tracked by Pixels include page views (when a user loads a specific webpage), content views (when a user interacts with a specific piece of content on a webpage), clicks (when a user selects a specific element on a webpage), form submissions (text or data a user inputs into a field on a webpage), and search queries (terms or phrases a user enters into a search box on a webpage).

14. Importantly, Pixel events represent a coordinated surveillance arrangement between websites and tech giants, like Facebook. A website lets Facebook watch their customers, and Facebook provides free tracking and analytics in exchange for data. Both profit from the arrangement at the expensive of consumer privacy.

***iii. Device fingerprinting***

15. Device fingerprinting refers to a broad category of techniques that are used to identify a user's device across visits (also called "sessions"). It works by collecting information about a user's hardware and software attributes, such as browser type, operating system, screen resolution, installed fonts, and time zone and language settings. The combination of these attributes becomes the user's "device fingerprint."

16. When combined, the probability that two users have identical attributes and settings is very low, even if they have the same type of device or browser. This is because the technical characteristics still vary based on individual configuration and software versions, which allow trackers to accurately and uniquely identify users without relying on cookies.

17. Canvas fingerprinting is a specific type of device fingerprinting that identifies and tracks a user's device based on these unique characteristics. It works by downloading a Javascript code when a user visits a webpage and runs it in the user's browser. This initiates a process completely invisible to a user.

18. The Javascript creates an invisible HTML canvas element—like a digital drawing board—and draws texts, shapes, and emojis on the canvas using various fonts and colors. The script then reads back the exact pixel values of what it just drew and runs these pixels through a

mathematical function (a "hash") that converts them into a "unique identifier." This unique identifier becomes the user's "device fingerprint."

19. The Javascript sends this fingerprint to a server, and the server uses it to recognize a user on future visits, without the use of any cookies.

20. The reason this process creates a unique identifier is because devices render graphics slightly differently based on their graphics card model, driver version, installed fonts, operating systems, screen resolution, and color calibration. These tiny variations create a unique pattern—like a fingerprint—that is remarkably stable and hard to change. This fingerprint persists even if a user clears their browser data.

***iv. IP Addresses***

21. IP addresses serve an important functional role on the internet by acting like a digital postal address that allows devices to send and receive data.

22. An IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (e.g., 192.168.123.132). The first two sets of numbers indicate what network the device is on (e.g., 192.168), and the second two sets of numbers identify the specific device (e.g., 123.132).

23. Functionally, to make a website load on a user's internet browser, the browser sends an "HTTP request" to Defendant's server where the relevant website data is stored.

24. In response to the request, Defendant's server sends an HTTP response back to the browser with a set of instructions.

25. The server's instructions include how to properly display the Website—e.g., what images to load, what text should appear, or what music should play.

26. Thus, the IP address enables a device to communicate with another device, such as a computer's browser communicating with a server.

27. However, IP addresses can also be used as potential user identifiers, especially when used in combination with additional data collected from the techniques described above.

28. Through an IP address, the specific device's state, city, and zip code can be determined.

29. Much like a telephone number, an IP address is a unique numerical code associated with a specific internet-connected device or household Thus, knowing a user's IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."

30. An IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code" and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests." Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service" because "[c]ompanies can use an IP address … to personally identify individuals."

31. For example, businesses who are trying to reach college-aged demographics can target devices on college campuses by sending advertisements to IP addresses associated with college-wide Wi-Fis. Or, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event. In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's IP address because it "can be more cost-effective than other forms of advertising." "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."

32. In addition, "IP address targeting can help businesses to improve their overall marketing strategy." "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."

33. Public IP addresses enable companies to monitor user interactions and behaviors across various websites and construct comprehensive profiles of users' browsing habits and preferences tied to their location.

34. They are especially effective in identifying and tracking specific individuals. As individuals use their devices across different locations (e.g., home, work, coffee shops, or other places), each location is assigned a distinct public IP address.

35. By tracking these patterns of movement between different IP addresses, businesses are able to build detailed profiles of individual users' daily routines and behaviors, which allows

them to differentiate an individual from others who might be accessing the internet using the same public IP address (e.g., other members of the same household).

36. For instance, if an individual visits websites on their laptop using their home IP address in the morning, their work IP address during the day, and returns to their home IP address in the evening, this sequence forms a distinctive pattern that can be used to identify that individual.

37. For these reasons, Europe's General Data Protection Regulation classifies IP addresses as "personal data," since they can potentially be employed "to identify an individual."

***vi. Session recording***

38. Session recording tools capture and replay user interactions on websites, creating a video-like recording of browsing sessions. They monitor mouse movements (every pixel traveled), clicks (what you clicked and where), scrolling (how far, how fast), form inputs (what you type, including deletions), page navigation (every page visited), and time spent on each element.

39. Importantly, session recording is qualitatively different from cookies or analytics. It is not just counting pageviews—it is creating a surveillance video of a user's online behavior.

40. Session recorders are highly invasive because of the level of nuance captured during a session. Because it captures deleted content, if a user types a message and deletes it, the recording captures exactly what they explicitly chose not to submit. It also reveals other user behaviors such as user hesitation, since it can record how long a use hovered over a "Buy Now" button before clicking on it (or not).

41. Session recorders have the potential to capture sensitive data such as passwords, credit cards, and health information, if not properly configured.

42. Moreover, real people at the companies who own the session recording technology have the ability to watch replays of user sessions and recordings are stored indefinitely for analysis.

**B. Tracking Technology on Defendant's Website**

43. Using a combination of the tracking technologies described above, Defendant actively caused user data to be collected, stored, transmitted, and shared with multiple third parties, including Google, Meta/Facebook, Quantum Metric, PerimeterX, Akamai, ThreatMetrix, Qualtrics, Microsoft/Bing, Adobe, AppNexus, Pinterest, Agkn, Forter, Sprinklr, Getamigo, Go-mpulse, and

other tracking vendors, by deploying tools, scripts, pixels, cookies, event listeners, and requests developed or operated by those companiesUsing a combination of the tracking technologies described above, Defendant actively shared user data with multiple third parties, including Google, Meta, Quantum Metric, PerimeterX, Akamai, ThreatMetrix, Qualtrics, Microsoft, AppNexus, and Pinterest, by deploying tools and scripts developed by these companies that collected, transmitted, and processed information from users who accessed the Website.

44. Pre-consent desktop testing of the Home Depot homepage at https://www.homedepot.com/ detected 52 cookies, 176 third-party trackers, 19 canvas-fingerprinting instances, 1 session recorder, 1 Facebook Pixel event, and 2 key-logging instances. Pre-consent desktop testing of the Home Depot varnish search-results page at https://www.homedepot.com/s/varnish?NCNI-5 detected 54 cookies, 218 third-party trackers, 17 canvas-fingerprinting instances, 1 session recorder, 1 Facebook Pixel event, and 2 key-logging instancesSpecifically, forensic testing confirmed that the Website deployed 176 third-party trackers, including 52 cookies, 19 different canvas fingerprints, and 1 session recorder. Defendant further shared data collected by these trackers with five major advertising networks.

### *i. Session Recorders*

45. Defendant deployed session recording technology on the Website using Quantum Metric, including the custom Home Depot script https://cdn.quantummetric.com/qscripts/quantum-homedepot.jsDefendant deployed session recorders on the Website using scripts and tools developed and operated by Quantum Metric.

46. Quantum Metric session recording on the Website captures a user's session visually, including screen recording, cursor movements, clicks, mouse tracking, and scroll behaviorThe session recorders on Defendant's Website captures a user's entire session visually, recording a user's cursor movements and clicks and tracking their page scrolling behavior.

47. The session recording technology is invasive because it records user interactions in real time. In addition to screen, mouse, and scroll tracking, form inputs and keystrokes, including user inputs and typed information during Website interactionsAs explained above, the session

~~recorders are highly invasive for several reasons, including the fact they capture all of a user's keyboard input, even if the information is not eventually submitted to the Website by the user~~.

***ii. Google Tracking Technology***

48. Google is one of the largest advertising companies in the country. To date, Google generates nearly 77.8% of its revenue through advertising bringing in a grand total of $305.6 billion. Google's advertising business has been extremely successful due, in large part, to Google's ability to target people at a granular level.

49. Defendant embedded Google Ads, Google DoubleClick, Google Analytics, Google conversion, and Google Tag Manager technologies on the Website, including Google-related cookies and requests that collect or transmit user behavior, device and browser characteristics, page views, content views, advertising identifiers, analytics identifiers, and ad-attribution data~~Defendant embedded Google Ads and Google DoubleClick scripts on its Website, which allowed it to actively share detailed information about users with Google, including device and browser characteristics, page views, and content views~~.

50. The Google Ads and Google DoubleClick scripts collect and transmit information about users' behavior across multiple websites, enabling Google to build detailed behavioral profiles for each user. These profiles are shared with advertisers within the Google Ad Manager ecosystem, allowing Google to show users particular advertisements based on their activity—a practice commonly known as "audience targeting."

51. The Website uses Google Tag Manager to deploy canvas-fingerprinting scripts. On the homepage, Google Tag Manager was detected as part of the Website's 19 canvas-fingerprinting instances. On the varnish search-results page, Google Tag Manager was detected as part of the Website's 17 canvas-fingerprinting instances. Those scripts access canvas font rendering, canvas geometry, and data URL extraction to create browser or device signatures used for tracking and analytics~~Additionally, the Website uses Google Tag Manager to deploy a script to perform canvas fingerprinting. This unique identifier is what allows Defendant and Google to track users across multiple websites~~.

52. Finally, if the user is logged into their Google account when visiting the Website, Google receives third party cookies allowing it to link the data collected by the code to the specific Google user, and derive demographic information about that user, such as age and gender.

### *iii. Meta/Facebook Pixel Tracking Technology*

53. Facebook is a social media platform and social networking service that also offers an advertising and analytics tool called Meta Pixel. The Meta Pixel is a snippet of code integrated into a website that enables businesses to "measure, optimize, and build audiences" for their ad campaigns by tracking user actions and behavior.[1] Once installed, the pixel is activated as soon as a user visits a website.[2]

54. Defendant uses scripts from Meta/Facebook on the Website to perform device fingerprinting. The Meta Pixel uses a device fingerprinting technique called browser fingerprinting to identify website users by collecting various attributes from a user's browser, such as browser type and version, installed fonts, screen resolution, time zone, and language settings. Using this information, the Meta Pixel creates a unique identifier for the user and associates it with all of the event data captured while the user interacts with the website. Meta uses the same unique identifier to track users across other websites in partner network, without using cookies.

55. Defendant embedded Meta/Facebook Pixel technology on the Website. On both the homepage and the varnish search-results page, the Meta/Facebook Pixel initialized through Pixel ID 325302054302543 and transmitted an Init event to facebook.com. The varnish search-results page transmitted a hashed external user ID, page URL, timestamp, user agent, and IP address to Meta/Facebook for Facebook pixel tracking, session establishment, and retargeting. The homepage transmitted a hashed external user ID, page-visit data, browser information, and timestamp to Meta/Facebook for Facebook tracking, session establishment, and retargeting~~Defendant also embedded scripts on the Website to track users' product views, shopping behavior, purchase history, URLs visited, and IP address~~.

[1] https://www.facebook.com/government-nonprofits/blog/the-facebook-pixel; https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[2] *Id.*

56. Data from the Website is combined with Facebook's broader tracking network across millions of websites, creating comprehensive profiles of users' shopping interests.

57. Facebook explains: "Once matched, we can tally [user] actions in the Facebook Ads Manager so you can use the data to analyze your website's conversion flows and optimize your ad campaigns. By default, the Pixel will track URLs visited, domains visited, and the devices your visitors use."

***iv. Advertising Networks***

58. An advertising network is a system that connects advertisers with websites by collecting data about how users interact with a website and delivering relevant ads based on the user's behavior. These advertising networks use unique identifiers—such as cookies or device fingerprints—to persistently monitor users across different websites and build a highly detailed behavioral profile of each user over time.

59. Defendant embedded or caused the Website to call advertising and analytics networks including Microsoft Advertising/Bing, Google Ads/DoubleClick, Facebook/Meta Ads, AppNexus, Pinterest Ads, Google Analytics, and Google Ads. These networks and requests included domains such as bing.com, c.bing.com, doubleclick.net, stats.g.doubleclick.net, ad.doubleclick.net, googleads.g.doubleclick.net, facebook.com, ib.adnxs.com, ct.pinterest.com, google-analytics.com, and googleadservices.com~~Defendant embedded the code for five different advertising networks on its Website, including Microsoft Advertising, App Nexus, and Pinterest, as well as the Google and Meta ad networks described above. By embedding this code, the Website automatically transmitted extensive information users' browsing behavior and identity to each of these third-party networks, including page views, product views, content interaction, IP addresses, and device and browser characteristics~~.

60. These advertising and analytics networks collect or receive data used for cross-site tracking, behavioral profiling, cross-site identification, advertising attribution, data sharing between advertising partners, and retargeting based on Website users' browsing behavior, product views, page views, interests, and purchase-intent signals~~These advertising networks also collect data on parameters that indicate how likely a user may buy a product or service—commonly known~~

as "purchase intent signals." The advertising networks then uses this data to show users ads based on their browsing behavior on Defendant's Website and other websites.

***v. Canvas Fingerprinting***

61. Defendant implements extensive canvas fingerprinting on the Website. The homepage deployed 19 canvas-fingerprinting instances through Google Tag Manager, PerimeterX, Akamai Bot Manager, ThreatMetrix, and Qualtrics. The varnish search results page deployed 17 canvas-fingerprinting instances through Google Tag Manager, Qualtrics, PerimeterX, and Akamai Bot ManagerDefendant implements extensive canvas fingerprinting on the Website across multiple third-party services, deploying 17 separate scripts from Google, Akamai, PerimeterX, ThreatMetrix, and Qualtrics.

62. These fingerprinting instances captured canvas font rendering, canvas geometry, and data URL extraction. By deploying multiple fingerprinting instances through multiple services, Defendant created highly unique browser or device identifiers capable of tracking users across sessions, including after a user clears cookiesBy integrating 19 separate fingerprinting instances across multiple vendors, this creates a highly unique and persistent identifier that can track users across sessions and websites.

63. The Website also deployed cookies and identifiers that store or process analytics, advertising, security, geolocation, session, visitor, and behavioral data, including THD_LOCALIZER, DELIVERY_ZIP, DELIVERY_ZIP_TYPE, AMCV_F6421253512D2C100A490D45%40AdobeOrg, kndctr_F6421253512D2C100A490D45_AdobeOrg_identity, _gcl_au, _ga, _gid, QuantumMetricSessionID, QuantumMetricUserID, ads, thda.s, thda.u, ajs_anonymous_id, _px, _pxvid, pxcts, bm_sz, bm_s, forterToken, and related Adobe, Microsoft/Bing, Agkn, Google/DoubleClick, and Sprinklr cookies.

64. The Website's cookies and requests included location-related storage and transmission. On the tested pages, IP-address-related data was explicitly found in cookies such as THD_LOCALIZER, DELIVERY_ZIP, DELIVERY_ZIP_TYPE, and either _px or _abck, and IP-address-related data was also collected through server logs and third-party tracker requests.

Location and ZIP-code-related data was detected in cookies such as THD_LOCALIZER, DELIVERY_ZIP, DELIVERY_ZIP_TYPE, and _abck.

65. The Website also deployed third-party Adobe Audience Manager cookies demdex and homedepot, Microsoft/Bing cookies MUID and MR, Agkn cookies u and ab, Google DoubleClick test_cookie, and Sprinklr live-chat cookie emqx-live-chat-tier2CORS.

66. The Website used local storage and session storage in addition to cookies. The homepage and varnish search-results page each stored 50 local-storage items on the user's browser. The homepage stored 18 session-storage items, and the varnish search-results page stored 17 session-storage items. These storage items included analytics, session, personalization, advertising, localization, device-fingerprinting, and user-experience identifiers.

67. The local-storage items included identifiers and values such as QM_S, QM_U, amigo-amigo-session-id, ajs_anonymous_id, forterToken, _gcl_ls, THD_AAPE, localizationMethod, BTT_GUID_PV, BTT_Collect, and PXJ770cP7Y-related PerimeterX storage. The session-storage items included PerimeterX session identifiers, Quantum Metric values, Adobe clickData, qmd, QSI_ActionSetHistory, qm_storeNumber, pxsid, and qm_last_page.

68. On the varnish search-results page, the Website stored page-context information including the page name "search results" and the URL https://www.homedepot.com/s/varnish?NCNI-5 in browser storage. On the homepage, the Website stored page-context information including the page name "homepage" and the URL https://www.homedepot.com/ in browser storage.

~~62.~~69. The information on consumer behavior gathered by has tremendous value to advertisers and to the Defendant. Similar market research on consumer behavior can increase overall sales by millions of dollars. In this way, Defendant and the advertisers have stolen information from Plaintiff, and the Class Members, of significant value. Participants in focus groups, for instance, are regularly paid $30-$500 per session. But instead of paying Plaintiff and the Class, Defendant and the Third Parties stole the information from Plaintiff and the Class.

**C. Defendant Aided and Abetted Third-Party Interception by Installing and Using Trackers on the Website to Collect Plaintiff's and Class Member's Communications Without Consent or Court Order**

~~63.~~70. Section 631 of CIPA prohibits the interception of communications without the consent of all parties and provides that a person who aids, abets, employs, or conspires with another to intercept communications may also be liable. Cal. Penal Code § 631(a).

~~64.~~71. In the internet context, courts repeatedly recognize that a third party becomes an unauthorized interceptor when a website embeds tracking technology that captures user communications in real time and permits the third party to use the intercepted communications for its owner commercial purposes. See *Smith v. Rack Room Shoes, Inc*., 2025 WL 1085169 at *4 (N.D. Cal. Apr. 4, 2025)(rejecting the argument that the trackers were not unauthorized third parties but "extensions" of the website); *Ambriz v. Google, LLC*, 2025 WL 830450 (third party trackers who have the capability to use the information transmitted are unauthorized parties regardless of their intent).

~~65.~~72. Defendant owns and operates the Website, https://www.homedepot.com which sells a range of home improvement products.

~~66.~~73. Defendant has long incorporated the code of the Trackers into the code of its Website, including when Plaintiff and other users visited the Website. Thus, when Plaintiff and other users visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

~~67.~~74. As outlined above, when a user visits the Website, the Website's code—as programmed by Defendant—installs the Trackers onto the user's browser so that it can be executed within the context of that website. Scripts, including tracking software, must be (re-)installed into the browser for each website that uses them, and so Defendant is solely responsible for the installation of the tracking software that will execute on its website.

~~68.~~75. Upon installing and executing the Trackers, Defendant used them to collect, store, intercept, and transmit identifying information, routing/addressing/signaling information, page content viewed, user behavior, input events, keystrokes, session interactions, page URLs, browser

and device information, location-related information, advertising identifiers, analytics identifiers, and other Website activity from Plaintiff and Class Members in real time or contemporaneously with their Website communicationsUpon installing the Trackers on its Website, Defendant uses the Trackers to collect the identifying information and user behavior and activity from Class Members and transmits that data to the third-parties that developed and operate the Trackers in real time.

69. The operators of the Trackers then used the correlated information of users, including Plaintiff and Class Members, for their own commercial purposes, including cross-site tracking, behavioral profiling, advertising attribution, retargeting, user matching, conversion measurement, marketing, analytics, and website-performance analysisThe operators of the Trackers then use the correlated information of users, including those of Plaintiff and Class Members, for their own commercial purposes, including targeted advertising, marketing, and website analytics.

At no time before Defendant installed, executed, stored, or used the Trackers on Plaintiff's and Class Members' browsers, or before Defendant caused the Trackers to collect, intercept, store, or transmit their information, did Defendant obtain Plaintiff's or Class Members' prior consent. Nor did Defendant obtain a court order to install or use the Trackers, pen-register processes, or trap-and-trace processes, or to transmit the information collected to unauthorized third-party recipientsAt no time prior to the installation and use of the Trackers on Plaintiff's and Class Members' browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members' consent for such conduct. Nor did Defendant obtain a court order to install or use the Trackers or to transmit the information collected to the unauthorized third-party Trackers.

76. Plaintiff did not provide affirmative consent to the tracking alleged herein.

77. Plaintiff did not use Global Privacy Control, Do Not Track, private browsing, blocked third-party cookies, an ad blocker, a VPN, or other anti-tracking settings during the Website visits at issue.

78. Pre-consent desktop testing of the homepage captured 52 cookies and 176 third-party tracker requests, and pre-consent desktop testing of the varnish search-results page captured

54 cookies and 218 third-party tracker requests. No consent-management cookies were detected in those pre-consent tests.

~~70.~~79. The Website's pre-consent testing did not verify any effective opt-out mechanism, cookie consent banner, privacy preference tool, or consent flow that blocked the challenged cookies, trackers, storage objects, event listeners, pixels, fingerprinting, session recording, or third-party requests before collection and transmission occurred.

~~71.~~80. Defendant programmed the Trackers to deploy immediately upon a user landing on the Website. Before a user can configure their privacy choices, the Trackers have already begun fingerprinting the user's device, recording the user's session, and downloading cookies and pixels onto their browser. Therefore, Defendant failed to obtain consent from Plaintiff and the Class Members prior to installing and using the Trackers on the Website, in violation of CIPA Sections 631 and 638.51.

~~72.~~81. Under the ECPA, the consent of one party is also insufficient where "such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d); see also, *Doe v. Meta Platforms, Inc.* (N.D. Cal. 2023) 690 F. Supp. 3d 1064, 1077.

~~73.~~82. Because Defendant's interception and disclosure of the communications also violates CIPA, as well as California's Comprehensive Data Access and Fraud Act and the right to privacy under the California Constitution, discussed *infra*, consent by United alone is insufficient to shield it from liability under the ECPA. See *Smith v. Rack Room Shoes, Inc.*, *supra,* 2025 WL 1085169 at *5 (the website tracking allegations are analogous to the purpose of engaging in a HIPPA violation, which courts consistently find constitutes an independent prohibited purpose.").

**D. Defendant's Conduct Constitutes an Unauthorized Interception of the Contents of Communications under CIPA and the ECPA**

~~74.~~83. Because the Trackers intercept information about the Website visitors' interactions with the Website, Defendant's use of the Trackers constitutes an unlawful interception and disclosure of an "electronic communication" under Section 2511 of the ECPA.

~~75.~~84. Defendant's use of the Trackers also constitutes an "unauthorized connection" which "reads, or attempts to read, or to learn the contents or meaning of [a] message, report, or communication" under Section 631 of CIPA.

~~76.~~85. "Contents" of a communication refer to "any information concerning the substance, purport, or meaning of a communication." *In re Zynga Priv. Litig*. (9th Cir. 2014)750 F.3d 1098, 1106–07)(internal quotations omitted). This includes button clicks, viewing history, cart history, or any other information that reveals a user's personal interests, queries, or habits. See also, *Mikulsky v. Bloomingdale's, LLC*, 2025 WL 1718225, at *1 (9th Cir. June 20, 2025)(session recording technology constitutes "contents" for the purposes of Section 631 of CIPA).

86. The communications intercepted by the Trackers, including the keypress event listeners, input event listeners, Meta/Facebook Pixel, Quantum Metric session recorder, analytics scripts, advertising scripts, and related third-party requests, are "contents" within the meaning of CIPA and the ECPA because they reveal substantive information about a user's searches, typed input, Website navigation, product interests, store-location activity, page content viewed, shopping behavior, household projects, repair needs, preferences, and potential consumer behavior~~The communications intercepted by the Trackers, which include two session recorders, are "contents" within the meaning of CIPA and the ECPA because they reveal substantive information about the user's interests, preferences, and potential consumer behavior~~.

87. On the varnish search-results page, Defendant's Website deployed keypress and input event listeners on product-search functionality. The keypress listener captured individual keystrokes in real time, and the input listener captured complete input field values. These event listeners operated on the same category of Website functionality Plaintiff used when he typed varnish-related search information, finish descriptors, and Behr paint searches into the Website search box.

~~77.~~88. On the homepage, Defendant's Website deployed keypress and input event listeners capturing keyboard input, including individual keypresses and form-field data entry. Those listeners operated before Plaintiff had any meaningful opportunity to provide informed consent.

**E. Defendant's Conduct Constitutes an Illegal Pen Register and Trap and Trace Device Under CIPA**

~~78.~~89. CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

~~79.~~90. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

~~80.~~91. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(b).

~~81.~~92. In plain English, a "pen register" is a "device or process" that records outgoing information, while a "trap and trace device" is a "device or process" that records incoming information.

~~82.~~93. Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology advanced, however, courts have expanded the application of these surveillance devices.

~~83.~~94. For example, if a user sends an email, a "pen register" might record the email address it was sent from, the email address(es) the email was sent to, and the subject line—because this is the user's outgoing information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from, the email address it was sent to, and the subject line—because this is incoming information that is being sent to that same user.

95. Defendant executes the Trackers on the user's browser for marketing, analytics, advertising, retargeting, personalization, fraud-prevention, security, and user-experience purposes. The Trackers collect, record, decode, or transmit routing, addressing, or signaling information including IP-address-related information, request URLs, destination domains, user-agent data,

browser information, device information, geolocation or ZIP-code-related information, persistent visitor identifiers, session identifiers, advertising identifiers, analytics identifiers, cookie IDs, local-storage IDs, session-storage IDs, and canvas-fingerprint identifiers.Defendant executes each of the Trackers on the user's browser for marketing and analytics purposes, and the Trackers collect information that identifies the outgoing "routing, addressing, or signaling information" of the user by through the collection of IP addresses through the 218 third-party trackers, as well as the device fingerprinting techniques and unique identifiers described above. Accordingly, the Trackers are each "pen registers."

96. The destination domains and request URLs recorded or transmitted by the Trackers included, among others, homedepot.com, assets.thdstatic.com, images.thdstatic.com, dam.thdstatic.com, clickstream-killswitch.hd-personalization-prod.gcp.homedepot.com, customer.homedepot.com, facebook.com, demdex.net, homedepot.demdex.net, bing.com, c.bing.com, doubleclick.net, stats.g.doubleclick.net, ad.doubleclick.net, googleads.g.doubleclick.net, google-analytics.com, googleadservices.com, ib.adnxs.com, ct.pinterest.com, client.px-cloud.net, collector-pxj770cp7y.px-cloud.net, tzm.px-cloud.net, tag.getamigo.io, s.go-mpulse.net, localization.thdws.com, and prod2-live-chat-tier2-mqtt.sprinklr.com.

84.97. The Trackers also collected source-identifying information reasonably likely to identify the user, browser, device, or location from which electronic communications originated, including IP-address-related information, user-agent data, browser-rendering data, device-fingerprinting data, persistent visitor IDs, session IDs, advertising IDs, analytics IDs, cookie IDs, local-storage IDs, session-storage IDs, and ZIP-code or store-location data.

85.98. The Trackers are "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley, supra*, 2023 WL 4833466, at *15.

86.99. The Trackers are a "device" because "in order for software to work it must be ran on some kind of computing device." *James v. Walt Disney Co*., 701 F.Supp.3d 942 (N.D. Cal. Nov. 8, 2023).

100. Because the Trackers record, decode, capture, or transmit both outgoing destination information and incoming or source-identifying electronic impulses, including page URLs, request URLs, destination domains, IP-address-related information, browser and device identifiers, location-related information, user-agent information, and unique visitor or session identifiers, the Trackers are pen registers and trap-and-trace devices or processes for purposes of CIPA sectionBecause the Trackers capture outgoing information that capture the source of a communication, they are a "pen register" for the purposes of CIPA section 638.50(b).

87.101. The installation and use of the Trackers occurred at least in part on Plaintiff's browser and device while Plaintiff was physically located in California. Defendant caused tracking code, cookies, pixels, event listeners, storage objects, and scripts to be delivered to, installed on, executed on, stored in, or used by Plaintiff's California-based browser and device during his Website visits.

**F. Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy**

88.102. The collection of Plaintiff's and Class Members' personally identifying information, nonanonymized identifying information, Website activity, typed input, search and product-interest information, store-location information, location-related information, browser and device identifiers, session identifiers, advertising identifiers, analytics identifiers, IP-address-related information, and page-interaction data through Defendant's installation and use of the Trackers constitutes an invasion of privacyThe collection of Plaintiff's and Class Members' personally identifying, nonanonymized identifying information, and Website activity through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

89.103. As alleged herein, the Trackers are designed to analyze Website data and marketing campaigns, conduct targeted advertising, and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' data.

**III. PLAINTIFF'S AND THE CLASS MEMBERS' EXPERIENCES**

104. Plaintiff Scott Evans visited the Website in December 2025 and again in January 2026. Plaintiff was physically located in California during each visit.Plaintiff Scott Evans has

visited the Website on multiple dates since November 2025 to browse for varnish with wood conditioner.

105. Plaintiff interacted with the Home Depot main/home page, paint-related pages, and a tools page. Plaintiff also interacted with product listings and product pages for paint, varnishes, tools, and hand-tool sets.

106. Plaintiff used the Website's general search function. Plaintiff searched for a certain kind of varnish, including the brand name and exact type of varnish he was looking for, in connection with his use of resin varnish for acrylic painting. Plaintiff also typed terms concerning matte, dull, and shiny finish, and searched for Behr paint.

107. Plaintiff did not use Website filters. Instead, Plaintiff used the general search function to see what results appeared.

108. Plaintiff used the Website's store-locator functionality for the San Carlos, California store. Plaintiff entered or selected ZIP code 94061 through the store locator. Plaintiff selected the San Carlos store and also viewed Belmont as a store location.

109. Plaintiff was trying to get a price or determine whether Home Depot had the product. Plaintiff may have checked product availability, although he does not specifically remember doing so, and he saw product-availability information indicating that an item was in stock.

110. Plaintiff did not maintain a Home Depot account, did not log into a Home Depot account, did not enter an email address, did not enter his name, did not enter his phone number, did not enter a shipping address, did not enter payment information, did not use a chat box, did not sign up by email, did not add any products to a cart, did not save products, did not compare products, and did not complete a purchase or check out on the Website.

90.111. Plaintiff did not have or use a Home Depot account.

112. The Trackers described above were found on the same Website and the same categories of pages Plaintiff used, including the Home Depot homepage and the varnish search-results page. Pre-consent testing of the homepage and the varnish search-results page detected cookies, third-party trackers, canvas fingerprinting, Meta/Facebook Pixel events, Quantum Metric session recording, keypress and input event listeners, local storage, session storage, IP-address-

related collection, geolocation or ZIP-code-related collection, persistent identifiers, advertising identifiers, analytics identifiers, and third-party requestsEach of the Trackers described above are found on the Website. Therefore, when Plaintiff visited the Website, the Website's code – as programmed by Defendant – caused the Trackers to be installed on Plaintiff's browsers.

113. The varnish search-results page tested by Plaintiff's investigators was the same type of product-search page Plaintiff used when he searched for varnish products, resin varnish, varnish finish attributes, Behr paint, paints, tools, and product availability or pricing information.

114. The varnish search-results page deployed two key-logging instances on product-search functionality: a keypress event listener capturing individual keystrokes in real time and an input event listener capturing complete input field values after changes. Plaintiff typed search-box entries on the Website, including varnish-related brand and finish information and Behr paint searches.

115. The varnish search-results page also deployed Quantum Metric session recording, Meta/Facebook Pixel tracking, Google Tag Manager, Google Ads/DoubleClick, Microsoft/Bing, Adobe Audience Manager, Agkn, AppNexus, Pinterest, PerimeterX, Akamai, Qualtrics, local-storage items, session-storage items, and third-party tracker requests.

91.116. The homepage deployed Quantum Metric session recording, Meta/Facebook Pixel tracking, Google Tag Manager, Google Ads/DoubleClick, Microsoft/Bing, Adobe Audience Manager, Agkn, PerimeterX, Akamai, ThreatMetrix, Qualtrics, Forter, local-storage items, session-storage items, cookies, keypress and input event listeners, and third-party tracker requests.

92.117. Defendant used the information collected by the Trackers and shared it with third parties to analyze Website data and marketing campaigns, conduct targeted advertising based on Plaintiff's locations, and ultimately boost Defendant's and advertisers' revenue.

93.118. Although Defendant uses at least several different Trackers on the Website, they all operate in the same manner and perform the same function, i.e., collecting Plaintiff's and Class Members' identifying information and Website activity. Thus, at any given time a user visits the Website, Defendant will cause one of the Trackers to be installed on users' browsers for the

purpose of collecting IP addresses and other user behavior data associated with the Plaintiff and Class Members.

~~94.~~119. .Shortly after visiting the Website, Plaintiff noticed an immediate increase in targeted advertising and junk e-mails regarding the products he searched on the Website.

~~95.~~120. Plaintiff and Class Members did not provide prior consent to Defendant to install, execute, store, or use the Trackers on their browsers or devices, or to intercept, collect, store, or transmit their Website communications, search-box inputs, product-interest data, store-location data, IP-address-related data, browser and device identifiers, local-storage identifiers, session-storage identifiers, advertising identifiers, analytics identifiers, or other Website activity~~Plaintiff and Class Members did not provide their prior consent to Defendant to install or use the Trackers on their browsers~~.

~~96.~~121. Defendant did not obtain a court order before installing or using the Trackers, pen-register processes, or trap-and-trace processes, or before causing the Trackers to capture routing, addressing, or signaling information from Plaintiff's and Class Members' browsers or devices~~Defendant did not obtain a court order before installing or using the Trackers~~.

~~97.~~122. Thus, like Plaintiff, Class Members had their privacy invaded by Defendant's alleged violations of CIPA sections 631 and 638.51(a), including through the pre-consent installation, execution, storage, interception, and transmission of cookies, pixels, event listeners, session-recording scripts, canvas-fingerprinting scripts, local-storage items, session-storage items, third-party requests, IP-address-related information, location-related information, page URLs, product-search activity, and persistent identifiers~~Thus, like Plaintiffs, Class Members have also had their privacy invaded by Defendant's violations of CIPA sections 631 and 638.51(a)~~.

~~98.~~123. Plaintiff seeks to access the Website again only if Defendant stops the challenged tracking, stops sending tracking-based pop-ups, and provides meaningful privacy protections, including meaningful notice, meaningful opt-in consent, clearer disclosures, and meaningful controls before third-party tracking technologies intercept, collect, store, or disclose his communications or personal data~~Plaintiff seeks to access the Website without third-party tracking~~

technologies intercepting and disclosing his communications or personal data, or, alternatively, to be provided with a meaningful choice regarding what data is collected.

## CLASS ACTION ALLEGATIONS

99.124. Class Representative Plaintiff brings this action on their own behalf and on behalf of all other persons similarly situated. The putative class that Class Representative Plaintiffs seek to represent is composed of:

**Nationwide Class**

All United States residents who accessed the Website and had their identifying information and website behavior data collected by the Trackers without consent and/or despite declining consent two years prior to the filing date of this Complaint through the date of an order granting class certification and/or a motion for preliminary approval of class action settlement (hereinafter the "Class").

**California subclass**

All California residents who accessed the Website in California and had their identifying information and website behavior data collected by the Trackers without consent and/or despite declining consent one year prior to the filing date of this Complaint through the date of an order granting class certification and/or a motion for preliminary approval of class action settlement (hereinafter the "Subclass").

100.125. Excluded from the Class are the natural persons who are directors, and officers, of the Defendant, as well as judicial officers, their families, and their staff who are assigned to this action. Class Representative Plaintiff expressly disclaims that they are seeking a class-wide recovery for personal injuries attributable to Defendant's conduct.

101.126. Plaintiff is informed and believe that the members of the Class are so numerous that joinder of all members is impracticable. While the exact number of the Class members is unknown to Class Representative Plaintiff at this time, such information can be ascertained through appropriate discovery, from records maintained by Defendant.

~~102.~~127. There is a well-defined community of interest among the members of the Class because common questions of law and fact predominate, Class Representative Plaintiff's claims are typical of the members of the class, and Class Representative Plaintiff can fairly and adequately represent the interests of the Class.

~~103.~~128. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the Defendant unlawfully read and/or intercepted communications by Plaintiff and members of the Class through use of the Trackers;

(b) Whether the Defendant unlawfully collected routing, addressing, and signaling information from Plaintiff and members of the Class through use of the Trackers;

(c) Whether Defendant violated CIPA section 631(a);

(d) Whether Defendant violated CIPA section 638.51(a);

(e) Whether Defendant violated the Wiretap Act, 28 U.S.C. section 2510 et seq.;

(f) Whether the Trackers are "pen registers" pursuant to Cal. Penal Code section 638.50(b);

(g) Whether Defendant sought or obtained prior consent—express or otherwise—from Plaintiff and the Class;

(h) Whether Defendant sought or obtained a court order for its use of the Trackers; and

(i) Whether Plaintiff and members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

Class Representative Plaintiff's claims are typical of those of the other Class members because Class Representative Plaintiffs, like every other Class member, were exposed to virtually identical conduct and are entitled to the same relief under the CIPA.

~~104.~~129. Class Representative Plaintiff will fairly and adequately protect the interests of the Class. Moreover, Class Representative Plaintiff has no interest that is contrary to or in conflict with those of the Class they seek to represent during the Class Period. In addition, Class

Representative Plaintiff has retained competent counsel experienced in class action litigation to further ensure such protection and intend to prosecute this action vigorously.

~~105.~~130. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the Defendant in the State of California and would lead to repetitious trials of the numerous common questions of fact and law in the State of California. Class Representative Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

~~106.~~131. Proper and sufficient notice of this action may be provided to the Class members through direct mail.

~~107.~~132. Moreover, the Class members' individual damages are insufficient to justify the cost of litigation, so that in the absence of class treatment, Defendant's violations of law inflicting substantial damages in the aggregate would go unremedied without certification of the Class. Absent certification of this action as a class action, Class Representative Plaintiff and the members of the Class will continue to be damaged by the practices of Defendant.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violation of the California Invasion of Privacy Act,

### Cal. Penal Code § 630, et seq.(a)

### (California subclass only)

~~108.~~133. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

~~109.~~134. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

~~110.~~135. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.

~~111.~~136. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

~~112.~~137. Cal. Pen. Code § 631(a) imposes liability upon: "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to lawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section . . . ."

~~113.~~138. Defendant used tracking software on the Website to intercept and collect information about Website visitors' behavior and activity on the Website.

~~114.~~139. CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

~~115.~~140. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

~~116.~~141. The Trackers are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—the IP address—from the electronic communications transmitted by Plaintiff's and the Class's computers or smartphones. Cal. Penal Code § 638.50(b).

142. At all relevant times, Defendant installed, executed, or used the Trackers—which are pen-register and trap-and-trace devices or processes—on Plaintiff's and Class Members' browsers and devices and used the Trackers to collect, record, decode, or transmit identifying, routing, addressing, or signaling information, including IP-address-related information, location or ZIP-code information, browser and user-agent information, device information, persistent visitor identifiers, session identifiers, advertising identifiers, analytics identifiers, request URLs, destination domains, cookie identifiers, local-storage identifiers, session-storage identifiers, and canvas-fingerprint identifiersAt all relevant times, Defendant installed the Trackers—which are pen registers—on Plaintiff's and Class Members' browsers and used the Trackers to collect identifying information of Plaintiff and Class Members, including IP addresses.

117.143. Defendant's Website captured outgoing destination information, including the Website page URLs, request URLs, and third-party destination domains contacted during a user's Website session. Defendant's Website also captured incoming or source-identifying information, including information reasonably likely to identify the browser, device, session, visitor, location, or source of the electronic communication.

118.144. Plaintiff and Class Members did not provide their prior consent to Defendant's installation or use of the Trackers.

119.145. Defendant did not obtain a court order to install or use the Trackers.

120.146. Pursuant to Cal. Penal Code section 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA sections 631(a) and 638.51(a). Plaintiff's injuries include loss of privacy, loss of control over Website communications and data, targeted advertising, junk emails, anxiety, embarrassment, loss of peace of mind, concern about household profiling, time spent clearing browser history and cache, browser or device slowdown, faster battery drain, and deterrence from future use of the Website absent meaningful privacy protections. Plaintiff and Class Members seek injunctive relief and statutory damages of $5,000 for each of Defendant's violations of CIPA sections 631(a) and 638.51(a).Pursuant to Cal. Penal Code section 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA section 631(a) and 638.51(a), and each seeks injunction and statutory damages of $5,000 for each of Defendant's

~~violations of CIPA section 631(a) and 638.51(a).~~

## SECOND CAUSE OF ACTION

### Violation of the Wiretap Act

### Title 1 of the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2510, *et seq.*)

~~121.~~147. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

~~122.~~148. The Wiretap Act prohibits the intentional interception, use, and/or disclosure of the contents of any wire, oral, or electronic communication. 18 U.S.C. § 2511(a), (c), (d).

~~123.~~149. "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. §2510(4).

~~124.~~150. "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication[.]" 18 U.S.C. § 2510(8).

~~125.~~151. "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation[.]" 18 U.S.C. § 2510(6).

~~126.~~152. Plaintiff is an individual and is therefore a "person" for purposes of § 2510(6).

~~127.~~153. Defendant is a corporation and is therefore a "person" for purposes of § 2510(6).

~~128.~~154. When Plaintiff and Class Members accessed Defendant's website, Defendant violated 18 U.S.C. § 2511(1)(a) by installing, executing, or using Trackers on Plaintiff's and Class Members' browsers and devices that intercepted or acquired the contents of their electronic communications, including keystrokes, input events, product-search interactions, page content viewed, Website navigation, shopping behavior, store-location activity, session activity, mouse movements, scroll behavior, and page URLs, without their consent~~when it installed Trackers on Plaintiff's browsers, which then intercepted and collected Plaintiff's identifying information, as well as dozens of other data points that revealed Plaintiff's and Class Members' behavior and~~

activity on the Website without their consent.

129.155. When Plaintiff and Class Members accessed Defendant's website, Defendant violated 18 U.S.C. § 2511(1)(c) by disclosing Plaintiff's and Class Members' identifying information, contents, Website behavior, search and input interactions, page-view data, location-related data, and browser/device information obtained from the Trackers to third parties without their consentwhen it disclosed Plaintiff's and Class Members' identifying information, behavior, and activity, obtained from the Trackers to third parties without their consent.

156. When Plaintiff and Class Members accessed Defendant's website, Defendant violated 18 U.S.C. § 2511(1)(d) by intentionally using Plaintiff's and Class Members' intercepted communications and Website activity, including their product-search interactions, page views, store-location activity, session activity, identifiers, and browser/device information, for targeted advertising, retargeting, cross-site tracking, behavioral profiling, analytics, conversion measurement, marketing, personalization, and revenue-generating purposeswhen it used Plaintiff's identifying information, behavior, and activity obtained from the Trackers for its own advertising and marketing purposes without their consent.

157. The interception occurred while Plaintiff's electronic communications were in transit or contemporaneously with transmission because the Website deployed keypress event listeners that captured individual keystrokes in real time, input event listeners that captured complete input field values after changes, Meta/Facebook Pixel events that transmitted page and browser information during the page visit, and Quantum Metric session recording that captured user interactions during the session.

158. Defendant cannot rely on Plaintiff's consent because Plaintiff did not provide consent before the challenged interception, collection, storage, use, or disclosure. Pre-consent testing captured extensive tracking and storage and no consent mechanism.

130.159. Defendant's interception and use were for the purpose of committing the criminal or tortious acts alleged in this Complaint, including unauthorized wiretapping, unauthorized pen-register and trap-and-trace activity, unauthorized computer access and use, invasion of privacy, and unfair competition. The intended uses included unauthorized real-time

capture, disclosure, retargeting, user matching, behavioral profiling, and cross-site tracking without prior consent.

~~131.~~160. As a result of Defendant's violations of the Wiretap Act, Plaintiff and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights, loss of their information and loss of money and costs incurred, all of which have ascertainable value to be proven at trial.

~~132.~~161. As a direct and proximate result of Defendant's violations of the ECPA, Plaintiff and Class Members suffered injury, including invasion of privacy, loss of control over communications and data, disclosure of Website activity and identifiers to unauthorized third parties, targeted advertising, junk emails, anxiety, embarrassment, loss of peace of mind, concern about household profiling, time spent clearing browser history and cache, browser or device slowdown, faster battery drain, and deterrence from future Website use absent meaningful privacy protections~~Pursuant to 18 U.S.C. § 2520, Plaintiff has been damaged by the interception, disclosure, and/or use of their communications in violation of the ECPA and are each entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and any profits made by Defendants as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (2) reasonable attorneys' fees and other litigation costs reasonably incurred~~.

## THIRD CAUSE OF ACTION

**Violation of the California Computer Data Access and Fraud Act**

**(California Penal Code § 502)**

**(California subclass only)**

~~133.~~162. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

~~134.~~163. The California Legislature enacted the CDAFA with the intent to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

~~135.~~164. The Legislature further declared that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data." Cal. Penal Code § 502(a).

~~136.~~165. For purposes of the statute, a number of definitions were provided. The term "access" means to "gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1).

~~137.~~166. The term "computer program or software" is defined as "a set of instructions or statements, and related data, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions." Cal. Penal Code § 502(b)(3).

~~138.~~167. The term "computer system" refers to "a device or collection of devices, including support devices and excluding calculators that are not programmable and capable of being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5).

~~139.~~168. Plaintiff's and Class members' web browsers used to access the Website are "computer software," and the computers on which Plaintiff and Class members used their web browsers constitute computers or "computer systems" within the scope of the CDAFA.

~~140.~~169. The statute also defines the term "data" to mean a "representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions." The statute further provides that data may be in "any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(8).

~~141.~~170. As discussed above, a website cookie, including a third-party tracker cookie, and an IP address are both "data" within the meaning of the statute.

~~142.~~171. Under California Penal Code § 502(c)(1), it is unlawful to knowingly access and without permission alter, damage, delete, destroy, or otherwise use any data, computer, computer system, or computer network in order to…wrongfully control or obtain money, property or data. Cal. Penal Code § 502(c)(1).

~~143.~~172. The statute also makes it unlawful to knowingly access and without permission take, copy, or make use of any data from a computer, computer system, or computer network. Cal. Penal Code § 502(c)(2).

~~144.~~173. The CDAFA further prohibits any person from knowingly accessing and without permission adding, altering, damaging, or destroying any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network. Cal. Penal Code § 502(c)(4).

~~145.~~174. Under subsections (6) and (7) of Penal Code § 502(c), a person also may not knowingly and without permission (i) provide or assist in providing a means of accessing or (ii) access or cause to be accessed any computer, computer system, or computer network. Cal. Penal Code §§ 502(c)(6) and (7).

~~146.~~175. Based on Defendant's unauthorized installation and storage of third-party tracking technology on Plaintiff's and Class members' web browsers, as alleged above, Defendant knowingly accessed and without permission altered and used Plaintiff's and Class members' data and computer systems in violation of Penal Code § 502(c)(1).

~~147.~~176. Similarly, the installation of the Trackers violates subsection (c)(4) because Defendant added and altered data and computer software on Plaintiff's and Class members' computers or computer systems. Cal. Penal Code § 502(c)(4).

~~148.~~177. By installing third-party tracking technology, Defendant also knowingly and without permission provided those trackers a means of accessing and/or caused to be accessed Plaintiff's and Class members' computers, computer systems, and/or computer networks in violation of Penal Code §§ 502(c)(6) and (7).

178. Further, Defendant's unauthorized collection and disclosure of Plaintiff's and Class members' personally identifying and addressing information to undisclosed third parties violates

Penal Code § 502(c)(2) because Defendant took and made use of data, including IP addresses, from Plaintiff's and Class members' computers, computer systems, or computer networks.

179. Defendant accessed Plaintiff's and Class Members' computers, computer systems, computer networks, browsers, browser storage, cookies, local storage, session storage, cache, and data without permission by causing the Website to deploy and execute cookies, pixels, keypress and input event listeners, session-recording scripts, canvas-fingerprinting scripts, local-storage items, session-storage items, and third-party requests before Plaintiff and Class Members provided meaningful consent.

180. The unauthorized access included access to device-rendering capabilities through canvas fingerprinting, browser storage through cookies/local storage/session storage, browser and user-agent information, IP-address-related information, location or ZIP-code-related information, keypress and input-event data, page URLs, page content viewed, session-interaction data, and persistent identifiers.

~~149.~~181. The Website's browser-storage access was substantial. The homepage stored 52 cookies, 50 local-storage items, and 18 session-storage items. The varnish search-results page stored 54 cookies, 50 local-storage items, and 17 session-storage items.

~~150.~~182. Plaintiff and Class members are citizens of California, and used their computers, computer systems, and/or computer networks in California. Defendant accessed or caused to be accessed Plaintiff's and Class members' data and other personally identifying information from within California.

~~151.~~183. Defendant was unjustly enriched by accessing, acquiring, taking, storing, and using Plaintiff's and Class Members' data, browser storage, device resources, computer systems, and Website communications without their permission or consent, and by using that information and access for advertising, analytics, retargeting, cross-site tracking, conversion measurement, personalization, marketing, and Defendant's own financial benefit~~Defendant was unjustly enriched by accessing, acquiring, taking, and using Plaintiff's and Class members' data and computer systems without their permission or consent, and using all of that identifying information to maximize revenue from selling advertising space on the Website and for~~

~~Defendant's own financial benefit. Defendant has been unjustly enriched in an amount to be determined at trial~~.

~~152.~~184. As a direct and proximate result of Defendant's violations of the CDAFA, Plaintiff and Class Members suffered damage or loss, including loss of control over data and browser storage, unwanted occupation and use of browser storage through cookies, local-storage items, and session-storage items, time spent clearing browser history, time spent clearing cache, browser or device slowdown, faster battery drain, and unwanted processing and use of their devices, browsers, storage, and data. Under Penal Code § 502(e)(1), Plaintiff and Class Members are entitled to compensatory damages, injunctive relief, and other equitable relief in an amount to be determined at trial~~As a direct and proximate result of Defendant's violations of the CDAFA, Plaintiff and Class members have suffered damages. Under Penal Code § 502(e)(1), Plaintiff and Class members are entitled to compensatory damages, injunctive relief, and other equitable relief in an amount to be determined at trial~~.

~~153.~~185. Plaintiff and Class members also are entitled to an award of reasonable attorneys' fees and costs under Penal Code § 502(e)(2).

**FOURTH CAUSE OF ACTION**

**Invasion of Privacy**

**(Violation of Art. 1, § 1, California Constitution)**

**(California subclass only)**

~~154.~~186. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

~~155.~~187. "Privacy" is listed in Article I, Section 1, of the California Constitution as a fundamental right of all Californians. That section of the Constitution provides as follows: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1.

~~156.~~188. The right to privacy in California's Constitution creates a right of action against private entities such as Defendant. To state a claim for invasion of privacy under the

California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

157.189. Plaintiff and Class Members have legally protected privacy interests in their Website communications, typed search-box entries, input events, product-search interactions, product views, page content viewed, store-location activity, location or ZIP-code-related information, IP-address-related information, browser and device identifiers, persistent visitor identifiers, session identifiers, advertising identifiers, analytics identifiers, local-storage identifiers, session-storage identifiers, and household or home-project information revealed through Website browsingPlaintiff and Class members have a legally protected privacy interest in their personally identifying information and addressing information that are captured, without notice or consent, when they access and view the Website. These privacy interests are recognized by the California Constitution, CDAFA, CIPA, HIPAA, and numerous other statutes.

190. Plaintiff and Class Members had a reasonable expectation of privacy under the circumstances because they could not reasonably expect that a home-improvement retail website would, before meaningful notice or consent, deploy keypress and input event listeners, session recording, screen recording, mouse tracking, scroll tracking, Facebook/Meta Pixel events, canvas fingerprinting, local storage, session storage, advertising identifiers, analytics identifiers, IP-address-related collection, location-related collection, and hundreds of third-party tracker requests to collect, record, store, and transmit their Website communications and activityPlaintiff and Class members had a reasonable expectation of privacy under the circumstances, as they could not have reasonably expected that Defendant would violate state and federal privacy laws. Plaintiff and Class members were not aware of and could not have reasonably expected that Defendant would use website tracking technology and install third party tracker cookies without notice or obtaining consent. Those unauthorized Trackers collected and transmitted to undisclosed third parties Plaintiff's and Class members' communications and personally identifying and addressing information, including their IP addresses, which contain geolocation data.

191. Plaintiff's expectation of privacy was heightened because his Website activity

concerned household and home-project information, repair needs, product preferences, location, local store access, and purchase-interest information, including varnish, resin varnish, matte/dull/shiny finish attributes, Behr paint, paints, tools, hand-tool sets, the San Carlos store, possible Belmont store information, ZIP code 94061, and product availability or pricing.

192. Plaintiff did not provide prior consent to the challenged tracking.

~~158.~~193. Defendant's intrusion was serious because it included real-time keypress capture, input-event capture, session recording, screen recording, mouse tracking, scroll tracking, Facebook/Meta Pixel transmission, third-party advertising and analytics transmissions, canvas fingerprinting, persistent identifiers, local storage, session storage, and location-related storage or transmission.

~~159.~~194. Defendant intentionally intruded upon Plaintiff's and Class Members' privacy by collecting, recording, storing, using, and disclosing their Website communications, search and input interactions, product-interest information, store-location activity, page content viewed, identifiers, browser and device information, IP-address-related information, location-related information, and session activity without prior consent~~Defendant's unauthorized (1) installation of the Trackers and (2) collection and disclosure to third parties of Plaintiff's and Class members' communications and personally identifying and addressing information, all without consent or adequate notification to Plaintiff and Class members, are an invasion of Plaintiff's and Class members' privacy~~.

~~160.~~195. The intrusion would be highly offensive to a reasonable person because it occurred on a retail website during ordinary home-improvement browsing, operated invisibly in the background, began before any meaningful privacy choice was made, disclosed or transmitted data to numerous third parties, captured interactions in real time, and enabled targeted advertising, retargeting, cross-site tracking, behavioral profiling, user matching, and household profiling~~Defendant's conduct constituted a serious invasion of privacy that would be highly offensive to a reasonable person in that (i) the information disclosed by Defendant and shared with third-party trackers was personally identifying information protected by the California Constitution and numerous California and federal statutes; (ii) Defendant did not have authorization or consent~~

to disclose those communications and personally identifying and addressing information, including IP addresses, to any third-party tracker embedded in the Website, and the Trackers did not have authorization to collect and use that information; and (iii) the invasion deprived Plaintiff and Class members of the ability to control the dissemination and circulation of that information, an ability that is considered a fundamental privacy right. Defendant's conduct constitutes a severe and egregious breach of social norms.

161.196. Plaintiff and Class Members were harmed by Defendant's invasion of privacy. Plaintiff's harm included loss of privacy, loss of control over personal data and communications, targeted advertising, junk emails, anxiety, embarrassment, loss of peace of mind, increased spam, concern about household profiling, time spent clearing browser history and cache, later use of a VPN, browser or device slowdown, faster battery drain, and deterrence from using the Website again unless Defendant stops the challenged tracking and provides meaningful privacy protectionsAs a direct and proximate result of Defendant's actions, Plaintiff and Class members have had their privacy invaded and have sustained injury, including injury to their peace of mind.

162.197. Plaintiff and the Class members seek appropriate relief for that injury, including but not limited to restitution, disgorgement of profits earned by Defendant as a result of or in connection with the intrusions upon Plaintiff's and Class members' privacy, nominal damages, and any and all other equitable relief that will compensate Plaintiff and Class members properly for the harm to their privacy interests.

163.198. Plaintiff also seeks such other relief as the Court may deem just and proper.

**FIFTH CAUSE OF ACTION**

**(Violations of the CALIFORNIA UNFAIR COMPETITION LAW, Cal. Bus. & Prof. Code §17200, *et seq.*)**

164.199. Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs.

165.200. Violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq., by engaging in unlawful, unfair, or fraudulent business acts and practices

that constitute "unfair competition" as defined in the UCL, including, but not limited to, the following:

a. by violating the provisions of the CIPA prohibiting unauthorized wiretapping, Cal. Pen. Code § 631, *et. seq*.;

b. by violating the provisions of the ECPA prohibiting unauthorized wiretapping, 18 U.S.C 2510, *et. seq*.;

c. by violating the provisions of the CIPA prohibiting unauthorized trap and trace, Cal. Pen. Code § 638.51;

d. by violating the CDAFA, Cal. Pen. Code § 502, *et. seq.;*

~~166.~~201. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff. Defendant's practice was also contrary to legislatively declared and public policies that seek to protect consumer data and ensure that entities do not share, collect, or transmit data without consumer consent, as reflected by laws like the CIPA, Cal. Penal Code §§ 631 & 632, the CDAFA, Cal. Penal Code § 502, *et seq*.; the California Trap and Trace Law, Cal. Penal Code § 638.51; and the ECPA, 18 U.S.C. § 2510, *et. seq*.

202. As a direct and proximate result of Defendant's unfair and unlawful practices and acts, Plaintiff was injured and lost money or property, including lost time spent responding to the challenged tracking by reviewing and clearing browser history and cache, loss of use and control of browser storage occupied by cookies, local-storage items, and session-storage items, loss of use and control of device and browser resources, device or browser slowdown, faster battery drain, and loss of control over his Website communications, search and product-interest data, store-location data, identifiers, browser and device information, and other personal data~~As a direct and proximate result of Defendant's unfair and unlawful practices and acts, Plaintiffs were injured and lost money or property, including but not limited to the loss of their legally protected interest in the privacy of their personal information, data, and communications. In addition, Defendant treated the personal information, data, and communications of Plaintiffs as its own property, and sold and/or otherwise used it for profit, causing a loss of money and property to Plaintiffs~~.

203. Plaintiff did not spend money responding to the tracking, but he did expend time and device resources. Defendant's challenged practices caused unwanted storage, processing, and use of Plaintiff's browser, device, cache, cookies, local storage, session storage, bandwidth, processing capacity, and battery resources.

~~167.~~204. Plaintiff also suffered UCL injury because Defendant's conduct deprived him of the benefit of using the Website without undisclosed or non-consensual third-party tracking, retargeting, key logging, session recording, canvas fingerprinting, persistent browser storage, and transmission of his Website activity and identifiers to unauthorized third parties.

~~168.~~205. Defendant knew or should have known that its collection, interception, storage, use, and disclosure of Plaintiff's and Class Members' Website communications, identifiers, browser and device data, search and input interactions, store-location data, and Website activity through the Trackers without meaningful prior notice or consent would violate CIPA, the ECPA, CDAFA, the California Constitution, and the UCL. Defendant's actions in engaging in the above-named unfair practices and deceptive acts were intentional, knowing, and willful, and/or wanton and reckless with respect to the rights of Plaintiff and Class Members~~Defendant knew or should have known that its sale of information to unauthorized third parties would violate the CIPA, ECPA, and CDAFA. Defendant's actions in engaging in the above-named unfair practice and deceptive acts were intentional, knowing, and willful, and/or wanton and reckless with respect to the rights of the Plaintiffs~~.

~~169.~~206. Plaintiff seeks relief under the UCL, including declaratory relief, attorneys' fees, costs and expenses, and injunctive or other equitable relief. Plaintiff seeks equitable relief to the extent legal remedies do not fully remedy ongoing or future harm, including because Plaintiff would not use homedepot.com again if Defendant continues the challenged tracking and would need Defendant to stop tracking, stop sending tracking-based pop-ups, and provide meaningful privacy protections before using the Website again~~Plaintiffs seek relief under the UCL, including declaratory relief, attorney fees, costs and expenses (pursuant to Cal. Code Civ. P. § 1021.5), and injunctive or other equitable relief~~.

**DEMAND FOR JURY TRIAL**

~~170.~~207. Plaintiff and the Class hereby demand trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment against Defendants as follows:

1. For an order certifying the Class, naming Plaintiff as the representatives of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;
2. For an order declaring that Defendant's conduct violates the statutes referenced herein;
3. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;
4. For statutory damages of $5,000 for each violation of CIPA section 631 and 638.51(a);
5. For statutory damages of $10,000 for each violation of the Federal Wiretap Act;
6. For pre- and post-judgment interest on all amounts awarded;
7. For an order of restitution and all other forms of equitable monetary relief; and
8. For an order providing injunctive and other equitable relief as necessary to protect the Plaintiff's interests as requested herein, including, but not limited to:
   a. Ordering that Defendant immediately cease and desist the unauthorized interception, transfer, release, sale, and disclosure of Plaintiffs' data;
   b. Ordering that Defendant remove, block, disable, control, update, manage, and audit any code, software, hardware, operations, systems, policy, procedure, protocols, and processes that allow all unauthorized third parties to intercept, access, copy, collect, take, open, view, monitor, mine, analyze, store, sell, gain, exchange, or otherwise use Plaintiffs' data;
   c. Ordering that Defendant purge, delete, and destroy in a reasonably secure manner data not necessary for its provision of services.
9. For an order awarding and the Class their reasonable attorney's fees and expenses and costs of suit.

Dated: June 16, 2026

**POTTER HANDY LLP**

By: ______________________________

James M. Treglio, Esq.
Mark Potter, Esq.
Isabel Rose Masanque, Esq.
Attorneys for Plaintiffs